```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
                                           :
WELLS FARGO BANK NORTHWEST, N.A.,          :
not in its individual capacity,            :
but solely as Owner Trustee,               :
                                           :
                     Plaintiff,            :
                                           :   09 Cv. 7313 (BSJ)(FM)
          v.                               :
                                           :
                                           :   Opinion and Order
SUNDOWNER ALEXANDRIA, LLC,                 :
                                           :
                     Defendant.            :
------------------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/16/10

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

On August 19, 2009, Wells Fargo Bank Northwest, N.A. ("Plaintiff") filed a complaint against Sundowner Alexandria, LLC ("Defendant"), alleging Defendant defaulted under several agreements concerning the leasing and subleasing of two aircraft. In its answer, Defendant counterclaimed that Plaintiff committed breach of contract and breached the covenant of good faith and fair dealing. Plaintiff subsequently moved to dismiss Defendant's first and second counterclaims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, Plaintiff's motion is GRANTED.

## BACKGROUND

In 2007, Plaintiff leased two Boeing model 737-48E aircraft to Defendant. (Countercl. ¶¶ 7, 24.) On approximately July 24, 2008, Defendant, with Plaintiff's permission, subleased

both aircraft to Olympic Airlines, S.A. ("Olympic"), a non-party to this case ("sublease agreements"). (Id. ¶¶ 8-9, 25-26.) Defendant simultaneously agreed to assign its rights under the sublease agreements to Plaintiff, thereby causing Plaintiff to become the lessor under the sublease agreements ("assignment agreements"). (Id. ¶¶ 11, 28.)

The parties simultaneously agreed to terminate the original lease agreements ("termination agreements"). (Id. ¶¶ 10, 27.) Despite agreeing to terminate the lease agreements, certain obligations, including Defendant's obligation to pay for the maintenance and repair of both aircraft, survived the termination of the lease agreements ("surviving obligations"). (Id.)

The parties simultaneously entered into two brokerage agreements, in connection with each aircraft. (Id. ¶¶ 12, 29.) Each brokerage agreement provided that Plaintiff would pay a monthly brokerage fee to Defendant based on rental amounts collected from Olympic pursuant to the sublease agreements. (Id. ¶¶ 12-13, 29-30.) Pending satisfaction of Defendant's surviving obligations, Plaintiff agreed to apply the monthly brokerage fees towards Defendant's surviving obligations. (Id. ¶¶ 13, 30.)

Defendant alleges that in August 2009, Plaintiff, without cause or justification, sought to terminate the sublease

2

agreements with Olympic by sending two notice of default letters to Olympic, thereby attempting to deprive Defendant of the monthly brokerage fee. (Id. ¶¶ 14, 31.) Plaintiff and Olympic subsequently agreed to an early termination of the sublease agreements and the early return of both aircraft. (Id. ¶¶ 16, 33.) Defendant alleges that Plaintiff, intentionally and in bad faith, excluded Defendant from Plaintiff's early termination negotiations with Olympic. (Id. ¶¶ 17, 34.)

As a result of Plaintiff's alleged breach of the termination agreements, the brokerage agreements, the assignment agreements, Plaintiff's alleged breach of the covenant of good faith and fair dealing, and Plaintiff's alleged malicious, wanton and reckless conduct in terminating the sublease agreements early, Defendant claims it suffered approximately $3.5 million in damages. (Id. ¶¶ 21, 38.)

In its memorandum of law in support of its motions to dismiss Defendant's first and second counterclaims, Plaintiff argues that Defendant fails to state a claim for breach of contract. Plaintiff also argues that Defendant fails to state a claim for breach of the implied covenant of good faith and fair dealing.

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a

claim upon which relief may be granted. "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true." Frasier v. Gen. Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991). The Court is also required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff. See California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 515 (1972).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). Instead, a plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. __, 129 S. Ct. 1937, 1940 (2009).

**CHOICE OF LAW**

Pursuant to the parties' contractual agreements, the laws of the State of New York govern the interpretation and enforceability of the agreements at issue in this case. (Countercl. ¶ 6.)

**DISCUSSION**

I. <u>Defendant Fails To State A Claim For Breach Of Contract.</u>

Defendant alleges that Plaintiff breached the assignment agreements, the termination agreements, and the brokerage agreements. (Countercl. ¶¶ 18-21, 35-38.) With respect to the assignment agreements and the termination agreements, however, Defendant fails to specifically plead the contractual provisions that Plaintiff allegedly violated. New York law requires a "complaint [to] allege the provisions of the contract upon which the claim is based." See <u>Atkinson v. Mobil Oil Corp.</u>, 614 N.Y.S.2d 36, 37 (N.Y. App. Div. 1994) (citation omitted). Because Defendant fails to allege the provisions of the assignment agreements or the termination agreements that Plaintiff allegedly violated, the Court finds that Defendant fails to state a claim for breach of those contracts. <u>See, e.g.</u>, <u>Peters v. Accurate Bldg. Inspectors Div. of Ubell Ent., Inc.</u>, 815 N.Y.S.2d 484 (N.Y. App. Div. 2006) (citations omitted).

With respect to Defendant's allegation that Plaintiff breached the brokerage agreements, although Defendant failed to introduce these documents as part of its counterclaims, Plaintiff introduced both agreements in a declaration in support of its motion to dismiss.[1] (Croasmun Decl. Ex. 1 and 3.) Because the brokerage agreements are "documents upon which the [counterclaims] rel[y] and . . . are integral to the [counterclaims,]" the Court considers both agreements. See Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005) (citation omitted); see also Nat'l Football League Props., Inc. v. Dallas Cowboys Football Club, Ltd., 922 F. Supp. 849, 852 (S.D.N.Y. 1996) ("Where a 'plaintiff fails to introduce a pertinent document as part of [its] pleading, defendant may introduce the exhibit as part of [its] motion attacking the pleading.'") (alteration in original) (citations omitted).

Defendant argues Plaintiff breached the brokerage agreements by failing to apply the brokerage fees towards satisfaction of Defendant's surviving obligations under the termination agreements or, in the situation that the brokerage fees exceeded the amount due in surviving obligations, to pay Defendant excess brokerage fees. (Countercl. ¶¶ 13, 19, 30, 36.) Although the Court "must accept the material facts alleged

---

[1] Both brokerage agreements were subsequently amended. (Croasmun Decl. Ex. 2 and 4.) The provisions at issue here, however, remained the same. (See id.)

6

in the complaint as true," see Frasier, 930 F.2d at 1007, when "the content of the contracts conflicts with allegations about those contracts made in the Complaint, the actual language of the contracts must control."  See Nat'l Football League Props., Inc., 922 F. Supp. at 852-53 (citation omitted).

Here, despite Defendant's allegations that Plaintiff "was obligated" to apply the brokerage fees to Defendant's surviving obligations or to pay Defendant the brokerage fees exceeding Defendant's surviving obligations (Countercl. ¶¶ 13, 19, 30, 36), Section 5(a) of each brokerage agreement specifically provided that "[u]pon termination of the Sublease [Agreement], for any reason whatsoever, th[e brokerage agreement] shall also automatically terminate concurrently therewith and the parties shall have no further obligations hereunder, except for those obligations expressly stated to survive such termination of the Sublease Agreement and/or this Agreement."  (Croasmun Decl. Ex. 1 ¶ 5(a) and Ex. 3 ¶ 5(a).)

Defendant does not allege that Plaintiff failed to apply or distribute the brokerage fees prior to the termination of the sublease agreements.  Instead, Defendant alleges that Plaintiff terminated the sublease agreements, which caused "the termination of the [brokerage fees] due and payable to" Defendant.  (Countercl. ¶¶ 18, 35.)  Under the express terms of the brokerage agreements, termination of the sublease

agreements, "for any reason whatsoever," required concurrent termination of the brokerage agreements, including all obligations thereunder, except those expressly stated to survive termination of the sublease agreements or the brokerage agreements. Because Plaintiff's obligation to apply or distribute the brokerage fees ended when the sublease agreements were terminated and because Defendant fails to allege that Plaintiff failed to satisfy an obligation expressly stated to survive the termination of the sublease agreements or the brokerage agreements, Plaintiff did not fail to perform under the express terms of the brokerage agreements. As a result, Defendant fails to state a claim for breach of the brokerage agreements.[2] See, e.g., Barker v. Time Warner Cable, Inc., 897 N.Y.S.2d 668, at *3 (N.Y. Sup. Ct. 2009) (explaining that "[t]he elements of a cause of action for breach of contract [in New York,] are (1) formation of a contract between plaintiff and defendants; (2) performance by plaintiff; (3) defendants' failure to perform; and (4) resulting damage") (citations omitted).

II. Defendant Fails To State A Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

---

[2] To the extent Defendant attempts to allege that Plaintiff violated other provisions of the brokerage agreements, Defendant fails to specifically allege the provisions that Plaintiff allegedly violated. Thus, the Court finds that Defendant fails to state a claim for any other alleged breach of the brokerage agreements. See Peters, 815 N.Y.S.2d at 484.

In its motion to dismiss, Plaintiff argues that although New York law implies an obligation of good faith and fair dealing into contracts, there can be no breach of the covenant of good faith and fair dealing when a party has done what the contract allows. As explained above, the brokerage agreements at issue here provided that "[u]pon the termination of the [sublease agreements], for any reason whatsoever, this Agreement shall also automatically terminate concurrently therewith." (Croasmun Decl. Ex. 1 ¶ 5(a) and Ex. 3 ¶ 5(a).) Another provision in the brokerage agreements authorized Plaintiff or AerLease UK Limited ("AerLease"), a non-party to this case, to whom Plaintiff assigned the sublease agreements (Pl.'s Mem. Supp. Mot. to Dismiss at 1 n.2; Croasmun Reply Decl. Ex. 1, A and Ex. 1, B), to "waive or amend any provision of the" sublease agreements, including "a temporary or permanent reduction in the amount of monthly" rent payable by Olympic. (Id. Ex. 1 ¶ 5(b) and Ex. 3 ¶ 5(b).) Based on this discretionary language, Plaintiff argues it "had free reign" over each aircraft.

While Plaintiff is correct that the duty of good faith and fair dealing cannot impose an obligation that is "'inconsistent with other terms of the contractual relationship,'" see Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291-92 (N.Y. 1995) (citation omitted), discretionary contract language does not give a party carte blanche to do anything he or she pleases.

9

Under New York law, "even an explicitly discretionary contractual right may not be exercised in bad faith so as to frustrate the other party's right to benefit under the agreement." Richbell Info. Servs., Inc. v. Jupiter Partners, L.P., 765 N.Y.S.2d 575, 587 (N.Y. App. Div. 2003) ("Richbell") (explaining that the implied covenant of good of faith "do[es] not create new duties that negate . . . explicit rights under a contract, but rather, seek[s] imposition of an entirely proper duty to eschew . . . bad-faith targeted malevolence in the guise of business dealings") (citations omitted). In Dalton, the New York Court of Appeals explained that when a "contract contemplates the exercise of discretion," a party may not "act arbitrarily or irrationally in exercising that discretion."[3] 663 N.E.2d at 291 (citation omitted).

---

[3] On prior occasions, courts in this district have dismissed, as a redundant, a party's separate claim for breach of the implied duty of good faith because, "'[u]nder New York law, parties to an express contract are bound by an implied duty of good faith," such that a "'breach of that duty is merely a breach of the underlying contract.'" See, e.g., Nat'l Football League Props., Inc., 922 F. Supp. at 855 (citations omitted). "New York Courts have repeatedly affirmed," however, "that a party may be in breach of an implied duty of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruit of its bargain." Gross v. Empire Healthchoice Assurance, Inc., 847 N.Y.S.2d 896, at *3 (N.Y. Sup. Ct. 2007) (citations omitted). Because the crux of Defendant's claim for breach of the implied covenant of good faith and fair dealing is that Plaintiff terminated the sublease agreements to deprive Defendant of the brokerage fees, the Court considers these claims separately from Defendant's breach of contract claim. See Chase Manhattan Bank, N.A. v. Keystone Distribs. Inc., 873 F. Supp. 808, 815 (S.D.N.Y. 1994) (noting that under New York law, "[a] party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations," where the party does something to "destroy or injure the right of another party to receive the benefits of the contract") (citations omitted).

10

In light of the fact that the brokerage agreements' discretionary language is not, by itself, sufficient to preclude Defendant from alleging that Plaintiff breached the implied covenant of good faith and fair dealing, the issue before the Court is whether Defendant pled "sufficient factual matter . . . that allows the court to draw the reasonable inference that" Plaintiff terminated the sublease agreements "in bad faith so as to frustrate [Defendant's] right to benefit under the" brokerage agreements. See Iqbal, 129 S. Ct. at 1949 (citation omitted); see also Richbell, 765 N.Y.S.2d at 587 (citations omitted).

In Iqbal, the Supreme Court explained that a court deciding a motion to dismiss should "begin [its] analysis by identifying the allegations . . . that are not entitled to the assumption of truth." 129 S. Ct. at 1951. Here, Defendant makes the following conclusory allegations, which the Court disregards: (1) Plaintiff, "without cause or justification, attempted to terminate the" sublease agreements in order to deprive Defendant of the brokerage fees[4] (Countercl. ¶¶ 14, 31); (2) Plaintiff "intentionally and in bad faith, excluded" Defendant from the early termination negotiations[5] (id. ¶¶ 17, 34); (3) Plaintiff's

---

[4] The Court disregards the culpability that Defendant attributes to Plaintiff, but not the allegation that Plaintiff attempted and succeeded in terminating the sublease agreements in order to deprive Defendant of the brokerage fees.

[5] The Court similarly disregards the culpability that Defendant attributes to Plaintiff, but not the allegation that Defendant was excluded from the early termination negotiations with Olympic.

11

"bad faith and malicious conduct in causing a termination of the" sublease agreements constituted a breach of the termination agreements, brokerage agreements, and assignment agreements[6] (id. ¶¶ 18, 35); (4) Plaintiff's "conduct in causing the unlawful termination of the [sublease agreements] was malicious, wanton and intentional" (id. ¶¶ 20, 37); and (5) as a result of Plaintiff's "malicious, wanton and reckless action in terminating the [sublease agreements] without cause or justification," Defendant suffered approximately $3.5 million in damages[7] (id. ¶¶ 21, 38). See Iqbal, 129 S. Ct. at 1951 (noting that conclusory allegations are "not entitled to be assumed true") (citation omitted).

The Court next considers the factual allegations in Defendant's counterclaims "to determine if they plausibly suggest an entitlement to relief." See id. Defendant makes two factual allegations to support its counterclaims. First, Defendant alleges that at the time Plaintiff attempted to terminate the sublease agreements by sending default notices to Olympic, Olympic was current on all of its payment obligations

---

[6] Although the Court already found that Plaintiff's termination of the sublease agreements did not constitute a breach of the termination agreements, brokerage agreements, or assignment agreements, see supra, the Court disregards the culpability Defendant attributes to Plaintiff's termination of the sublease agreements.

[7] The Court again disregards the culpability that Defendant attributes to Plaintiff, but not the allegation that Defendant suffered approximately $3.5 million in damages as a result of Plaintiff's conduct.

12

to Plaintiff and there was no event of default. (Countercl. ¶¶ 14-15, 31-32.) To support this allegation, Defendant appends Olympic's reply to the notices of default, which states, among other things, that Olympic was up-to-date on its payments when it received the default notices. (Id. Ex. A.) Second, Defendant alleges that Plaintiff excluded Defendant from Plaintiff's early termination negotiations with Olympic. (Id. ¶¶ 17, 34.)

As part of its reply memorandum in support of its motion to dismiss, Plaintiff appends the notices of default referenced in Defendant's counterclaims. (Croasmun Reply Decl. Ex. 1, A and Ex. 1, B.) Although not introduced in Defendant's counterclaims, the Court considers the notices of default because they are "documents upon which the [counterclaims] rel[y] and which are integral to the [counterclaims]." See, e.g., Subaru Distribs. Corp., 425 F.3d at 122 (citation omitted). The Court does not consider, however, the other letters attached to the notices of default, as they are neither referenced nor relied upon in the counterclaims.

In the notices of default, which were sent by an AerLease "Servicer" to Olympic, AerLease cites various sources, including news reports, Greek laws, and share sale and purchase agreements between Olympic and other parties referencing a "'Longstop Date' of 30 September 2009," suggesting that Olympic would cease to

13

carry on its business on approximately September 30, 2009. (Croasmun Reply Decl. Ex. 1, A and Ex. 1, B.)  Although Olympic asserts that it was current on its payments to Plaintiff in its reply to the notices of default, the notices themselves neither reference nor suggest any problems regarding past payments.  In fact, even in Olympic's reply, with the exception of the brief statement that Olympic had not "suspended payments" (Countercl. Ex. A at 4), the crux of the reply is that Olympic was not going out of business and would be able to meet its future contractual obligations.

Although Olympic's reply denies, as Defendant emphasizes, an event of default, the nature of the alleged default—namely, that Olympic was going out of business—does not allow the Court to draw the reasonable inference that Plaintiff attempted to terminate the sublease agreements in bad faith in order to deprive Defendant of the brokerage fees or for some other arbitrary or irrational reason.  See Richbell, 765 N.Y.S.2d at 587; see also Dalton, 663 N.E.2d at 291.  Instead, the obvious and more likely explanation, as evidenced by the notices of default and Olympic's reply, is that Plaintiff sought to terminate the sublease agreements and secure the early return of its aircrafts out of concern that Olympic was going out of business, which, in fact, happened on September 29, 2009.  See, e.g., Kerin Hope, Revamped Olympic returns to the skies, FINANCIAL

14

TIMES, Sept. 30, 2009, available at http://www.ft.com/cms/s/0/c7e21c3a-ad58-11de-9caf-00144feabdc0.html.

The Supreme Court has recently found, on two occasions, that a party failed to establish that its claims were plausible when an "'obvious alternative explanation'" accounted for the alleged misconduct. See Iqbal, 129 S. Ct. at 1951-52 (finding that the arrest and detention of a Muslim Pakistani, in the wake of the September 11th terrorist attacks, was more likely "justified by [the] nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts" than by the "purposeful, invidious discrimination" the detainee asked the Court to infer) (citation omitted); see also Twombly, 550 U.S. at 551, 567-70 (finding that plaintiffs did not plausibly suggest an unlawful agreement, in violation of the Sherman Act, when defendants' "'parallel course of conduct . . . to prevent competition'" was not only compatible with, but more likely explained by, lawful, unchoreographed free market behavior) (citations omitted). Because there is an "'obvious alternative explanation'" for Plaintiff's decision to terminate the sublease agreements with Olympic and to secure the early return of both aircraft, the Court finds that Defendant failed to plead "sufficient factual matter . . . that allows the court

to draw the reasonable inference that" Plaintiff terminated the sublease agreements "in bad faith so as to frustrate [Defendant's] right to benefit under the" brokerage agreements. See Iqbal, 129 S. Ct. at 1949 (citation omitted); see also Richbell, 765 N.Y.S.2d at 587 (citations omitted).

Defendant's factual allegation that Plaintiff excluded Defendant from Plaintiff's early termination negotiations with Olympic does not alter the Court's analysis for three reasons. First, Defendant, by its own admission, "assigned its rights under the [sublease agreements] to [Plaintiff], as a result of which [Plaintiff] became the lessor under the [sublease agreements.]" (Countercl. ¶¶ 11, 28.) Second, despite the myriad of agreements between the parties, including the assignment agreements, Defendant fails to identify a single contractual provision indicating that Plaintiff was required to include Defendant in Plaintiff's early termination negotiations with Olympic. Third, apart from the agreements between the parties, Defendant provides no legal authority for the proposition that Plaintiff's failure to include Defendant in Plaintiff's early termination negotiations with Olympic constituted bad faith.

16

**CONCLUSION**

For the reasons provided above, Plaintiff's motion to dismiss Defendant's first and second counterclaims is GRANTED.

SO ORDERED:

*Barbara S. Jones*
BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Dated:   New York, New York
         August 16, 2010

17